# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 9, 2013 Session

## STATE OF TENNESSEE v. ARCHIE ELLIOTT,
## also known as ARCHIE ELLIOTT, III

### Appeal from the Criminal Court for Shelby County
### No. 12-01157    Paula Skahan, Judge

### No. W2012-02452-CCA-R3-CD  - Filed December 18, 2013

The defendant, Archie Elliott, also known as Archie Elliott, III, was indicted for two counts of aggravated cruelty to animals while he was employed by the Memphis Animal Shelter. He entered open pleas of guilty to these offenses and was sentenced, in each count, to two years confinement, with the sentences to be served concurrently. On appeal, he asserts that the trial court erred in both the length and manner of service of the sentences, which were to be served, as a Range I, standard offender, at 30%; that the court showed bias in statements regarding the court's feelings regarding animals; and that the court erred in weighing the impact of letters opposing alternative sentencing. Following our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Latonya Burrow, Memphis, Tennessee, for the appellant, Archie Elliott, also known as Archie Elliott, III.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At the submission hearing, the State explained the bases for the charges against the

defendant, which defense counsel stipulated would have been proven had the case gone to trial:

On February the 11th of 2012, Detective Daniel [Arrington] was working in an undercover capacity at Memphis Animal Services here in Memphis, in Shelby County, Tennessee.

He observed this defendant, Archie Elliott, to bring a small dog, identification number A237300 into the ER room on a leash.

The dog did not want to walk while leashed and appeared to be timid, at the time [the defendant] stated that he want to act stupid [sic], I know how to take care of this. Detective [Arrington] then observed [the defendant] pull the dog through the air on the leash and straddle the leash across the sink counter choking the dog.

[The defendant] stated at the time, this is my sedation. The dog gasped for air while hanging in the air by the leash.

[The defendant] was asked by another technician at the time, . . ., basically why are you doing this and he did not respond but continued to hang the dog.

Mr. [Frank] Lightfoot[1] who was a technician at the time stated, Mr. Elliott, I didn't know that you do it like that. Mr. Lightfoot then administered the fatal solution to the dog's heart without any sedation.

That happened February the 11th, 2012.

February the 23rd of 2012, [Detective Arrington] observed [the defendant] working in the ER room again euthanizing animals. A medium sized dog case number A237555 was brought to the ER room to be euthanized and the detective observed [the defendant] to attempt to administer the solution to the dog intravenously but the dog began to jerk away.

[The defendant] did not attempt to utilize the sedation or the dog equipment to restrain the dog, but instead placed the needle with the fatal solution directly into the heart of the dog without using any sedation, at which

---

[1]Lightfoot pled guilty to four counts of aggravated cruelty to animals.

time the dog pulled away as it urinated on the floor.

Detective [Arrington] pleaded to [the defendant] to utilize the equipment, a flex-gate supposed to be used to restrain the dog. [The defendant] stated if I use the gate it's going to mess up the floor and I don't like cleaning up. [The defendant] then attempted to hang the dog while straddling the leash, attached the dog's neck across the sink counter until a noise was heard outside the room.

[The defendant] then finally put the dog in the gate to restrain it but did not use any sedation for the dog. He then administered the solution directly to the dog's heart until it was dead.

This did occur in Memphis and Shelby County, Tennessee, and we ask for a stipulation by counsel.

[DEFENSE COUNSEL]: Your Honor, defense counsel will stipulate that those would have been the facts presented by the State had these matters proceeded to trial and ask the Court to accept the plea agreement.

We will review the testimony of the witnesses at the sentencing hearing.

Detective Daniel Arrington of the Memphis Police Department testified that because of complaints of "animal fighting [and] animal cruelty" occurring at the Memphis Animal Shelter, he began working there as an undercover officer on November 29, 2011. He testified as to the February 11, 2012 incident:

Technicians Frank Lightfoot and another technician . . . and [the defendant] were working inside the Memphis Animal Shelter. [The defendant] brought a small Chow dog inside of the ER room which was to be euthanized and the dog appeared to be timid. It didn't want to walk at which point [the defendant] state[d], "Now you want to act stupid. I know how to take care of this." I then observed [the defendant] take the dog, which was leashed at the time, and straddle the dog over a counter inside of the ER room.

Detective Arrington said that the defendant "straddled the dog across the sink choking the dog." While the dog was "dangling," Frank Lightfoot "directly injected the dog to the heart with the fatal plus solution without using any sedation." The witness explained that the normal procedure for such a situation was that "another employee would help restrain the dog by wrapping his mouth and holding it. The person who is responsible for euthanizing

animals would simply inject the dog with the fatal plus solution intravenously by just taking one of its front paws, finding the vein and injecting it."

Detective Arrington related what he observed on February 23, 2012, of the defendant's actions at the shelter:

> On this day a midsized Chow dog was brought into the ER room to be euthanized and I observed [the defendant] attempt to administer the fatal plus solution to the dog intravenously at which point he failed and the dog began to jerk away. [The defendant] stated that he did not want to use any – well, he . . . didn't use any sedation or equipment to properly restrain the dog, which was there, . . ., at which point I observed him then try to place the needle directly into the heart of the dog at which point the dog pulled away again at this point urinating on the floor because he felt the needle . . . go into his heart.
>
> . . . I asked [the defendant] if he wanted to use the flex-gate, the equipment, right there provided to actually restrain the dog. At which point he stated if I use the gate it's going to mess up the floor and I don't feel like cleaning. [The defendant] then attempted to hang the dog by straddling the leash attached to the dog's neck across the sink counter.

He said that sedation for the two dogs was available on the days they were euthanized.

Additionally, the witness testified about a third incident involving a puppy:

> [The defendant] was working as . . . the technician inside the ER room for that day and a small puppy, pit bulldog, was about to be euthanized. [The defendant] looked at the dog and state[d], "You're too small. You're going to have to get stuck. I don't feel like fooling with you." [The defendant] then did not use any sedative for the small puppy. He then lifted the front leg of the dog and administered the fatal plus solution directly into the heart of the dog. The dog just whelped faintly until it died.

Detective Arrington said that none of the three dogs had tried to attack the defendant and that the defendant's attitude at the time was "just kind of a very lax or lazy."

Several witnesses testified on behalf of the defendant. Rudy Walker, the defendant's brother-in-law, said that the defendant had "become very developed to be a great young man when it comes to being responsible." He said that the defendant had owned a dog and that the defendant and his family "always had a dog, the family, for most of the time that [the

-4-

witness had] known them and interacted with the pets quite well." He agreed that, in his opinion, the defendant should be placed on diversion.

Reverend Gregory Askew testified that he was the pastor at the Jubilee Church of God in Christ and that the defendant was both a deacon at the church and the witness's son-in-law. He said that the defendant was "[c]onsiderate, kind, [a] hard worker, productive, at this point he is of course working and in school so I consider him productive, energetic."

Thomas Burgess, a pastoral assistant at the Jubilee Church of God in Christ, testified that he had known the defendant for about ten years. He described his high opinion of the defendant:

> The kind of person that would do anything to help anybody, compassionate with kids. He loves kids. Kids can be unruly, particularly in a church environment but he has this ability to relate to them in a way that makes them comfortable and that's just one of the many things that he does around the church.

Shalunda Elliott testified that she had been married to the defendant for seven years. She said that the allegations of the indictments were out of character for him:

> The Archie Elliott that I know is loving. He's caring. He's a hard worker. The Archie Elliott that I know is the one that brought home a puppy to foster and he was the one that got up in the middle of the night and took care of it because I was like, okay, that's your baby. So you take care of it and he did. So these allegations don't sound like the Archie that I know.

Mrs. Elliott said that the defendant previously had told her that he disliked certain duties of his job at the shelter:

> He often came home and talked about the stress and the struggles that he had at work, the fact that he didn't like going into the euthanasia room and on several occasions he'd spoken with the supervisor to say that he wasn't . . . wanting to go in there but the supervisor was like, well, that's your job and you need to go in. So he did talk about the stress and really not wanting to do it.

The defendant testified that he began working at the animal shelter on January 8, 2007, and that his duties were "to feed, clean, intake of dogs into the shelter, and also euthanize them." He said that, while at the shelter, he had been bitten "[a]bout four times." He said that between fifty and eighty dogs were euthanized every day.

Norris Gray testified that he was the defendant's current employer at the Kirby Pines Retirement Community. As to the defendant's job performance, Gray said that "[h]e does a good job. The residents like him. The staff loves him. He does what he [is] told."

At the conclusion of the hearing, and following the arguments of counsel, the trial court explained that it credited the testimony of Detective Arrington over that of the defendant:

> Looking at facts considering granting or denying diversion, the accused['s] amenability to correction, you do have a work history. I find it interesting that the only information given to Probation was about your job with the animal shelter. Nothing was told to them about St. Jude but you did provide information about the military. I don't have any information in here about your current job but you did provide that through your new boss's testimony.
>
> But other than working I have a very hard time with your testimony. Everything I heard from you was minimizing your behavior in this case. You basically wanted your cake and to eat it too. You want diversion but you do not want to accept responsibility for the unspeakable acts that took place at the Memphis Animal Shelter.
>
> I do credit the detective's testimony over yours. For some reason you can't seem to own up to exactly what you did involving the two Chow dogs . . . that [you were] indicted for back in March. That incident occurred in February of this year. I do not believe this is 99.9 percent you're just a great guy. I believe that there were many abuses at the animal shelter and that's the reason that finally they had to send someone undercover and I suspect this was a fairly routine thing with you in abusing animals if you got frustrated with their behavior.
>
> So . . . I'm sorry that you could not come in here and own up to . . . your horrific behavior especially as it related to the Chow dogs and an eyewitness to what you had done. The circumstances of the offense I've already discussed.

The court next outlined the defendant's social and work history and lack of a prior criminal history:

> Your criminal record you don't have any. Your social history appears to be pretty good. You're married. I notice that you didn't list any children

-6-

here.  I don't know if they're your wife's children why you don't list them anyway but it says when asked to describe your feelings about past or current family relationships, you report are [sic] relationship is okay so not exactly a ringing endorsement.

As far as other items listed here, states that you first used marijuana at age twenty-seven.  The status of [the] accused['s] physical and mental health appears to be fine.  Deterrence value to the accused as well as to others, . . . I don't know what is it [sic] but people here in Memphis and Shelby County and the horrible times we have had with the Memphis Animal Shelter and why we can't seem to hire people that love animals.  It just seems to be just a job. . . . I don't think you love animals.  No one that loves animals would have done the things that you did and . . . I really think that the deterrence value to you as well as to others is to not place you on diversion.

And then whether judicial div[ersion] will serve the interest of the public as well as the accused, those letters come from not only people here in Memphis and Shelby County but they come from people who used to live here in Memphis and I remember one I read in particular that said she lives in Knoxville.  She came here to go to dental school and that she would always defend Memphis to her friends when they said it was so crime ridden and dirty and whatever but she couldn't defend Memphis about this horrible story about the workers at the animal shelter and how they abused these dogs.  That was the final straw.  She could not defend Memphis any longer.

I got letters from across the country.  I got phone calls which I had to give to my secretary because I didn't think it was appropriate to speak with people that are so upset about this case and especially about you, Mr. Elliott, with stringing up that Chow dog like that. . . .  [P]eople . . . across the country just cried when they read that.  That's how horribly this has affected so many people just imagining a human being coming up with that idea and actually executing it.

So I do think denying judicial diversion will serve the interest of the public and weighing all of these factors judicial div[ersion] is denied.

Now, looking at the range of punishment, I do find Enhancement Factor No. 1 that you do have a previous history of criminal behavior in the marijuana smoking that you've admitted to and I do find other acts of abuse other than those with which you're currently charged from Detective Arrington's

-7-

testimony.

I do find No. 4 that – I don't know that there's any case law on this. I think they're usually talking about victims as human beings but I think that the victims of these offenses were particularly vulnerable because of their being dogs not able to call out for help and that they trust us to take care of them and not treat them with such cruelty. So I am going to find that second enhancement factor. So I do find two enhancement factors.

As far as being a leader in the offense, the one with the . . . small Chow dog, that was picked up and then Mr. Lightfoot took the injection and stabbed it into the heart of the Chow. I will find him to be a leader in the commission of the offense involving two or more criminal actors so three enhancement factors. That's only on one of the offenses, one of two.

Mitigation I think it's interesting that the information has been presented to me about being a great guy in the service. He participated in 2003 Retiree Appreciation Day and I think it is certainly a good thing that he served our country in the military and that he has attended ITT Tech and done very well grade wise but it makes it all the more shocking that he would behave in such a manner. He's attending school and doing so well while he's saying how stressed he is and can't control himself.

You can't have it both ways. I would think having served in the military would have given him more of an ability to show more honor and integrity at Memphis Animal Service[s] and to stand up for dogs rather than treating them with such disrespect. So . . . I can't find any mitigating factors.

I also do not think consecutive sentencing is applicable in this case. The [S]tate cited that the defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood. . . . I don't believe that's applicable here. I don't find any of these to . . . fit this particular situation.

But with two enhancement factors, no mitigating factors – I mean we're supposed to work. We're supposed to further our education and due to the just horrible nature of the offense, I find that that . . . calls for the maximum which in a case like this which is a Class E felony, only calls for two years in the workhouse. It's a Class E felony the lowest felony there is which perhaps should be addressed with the legislature, but that is the maximum penalty

allowed.

I'm going to sentence $500 fine on each. $500, two years for each – sorry, there's . . . three enhancements on one and two on the other but I'm going to sentence on each case two years and a $500 fine.

Now, as far as probation, having considered the pre-sentence report, having looked, again, very similar to diversion, physical, mental and social history, facts and circumstances surrounding the offense, we've already discussed criminal history or lack . . . thereof in this case, previous actions and character of the defendant, whether or not the defendant might reasonably be expected to be rehabilitated, I do think that he could stay out of trouble.

[The defendant] could stay out of trouble and work for two years not picking up another case but I also think that probation would unduly depreciate the seriousness of this offense and I think confinement is particularly suited to . . . provide an effective deterrent to others likely to commit similar offenses and that the offense is particularly enormous, gross or heinous so probation is denied[.]

## ANALYSIS

As we have set out, the defendant argues on appeal that the trial court erred in determining the length and manner of service of his sentences; that the court showed bias in statements regarding the court's feelings for animals; and that the court gave undue weight to letters to the court opposing alternative sentencing.

### I. Sentencing

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who is found guilty or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought, is not seeking deferral of further proceedings for a sexual offense, a violation of section 71-6-117 or section 71-6-119, or a Class A or Class B felony, and who has not been previously convicted of a felony or a Class A misdemeanor. Id. § 40-35-313(a)(1)(B)(i). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b).

The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). As such, it will not be disturbed on appeal absent an abuse of discretion. Electroplating, 990 S.W.2d at 229; Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168. To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572

In determining whether to grant diversion, the trial court must consider all of the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. Id.

With conflicting results, panels of this court in State v. Kiara Tashawn King, No. M2012-00236-CCA-R3-CD, 2013 WL 793588, at *6-7 (Tenn. Crim. App. Mar. 4, 2013), perm. app. granted (Tenn. Aug. 14, 2013), and State v. Shanice L. Dycus, No. M2012-02297-CCA-R3-CD, 2013 WL 5371957, at *6-7 (Tenn. Crim. App. Sept. 25, 2013), discussed the impact of the supreme court decisions of State v. Bise, 380 S.W.3d 682, 707-08 (Tenn. 2012) and State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) on our review of a denial of judicial diversion. The panel in King concluded that the holdings in Bise and Caudle are applicable to diversion reviews by this court, while the panel in Dycus reached an opposite conclusion. Regardless of whether King or Dycus is followed in this matter, the result is the same.

In the present case, the trial court, in a lengthy ruling concluding the sentencing hearing, explained why the defendant would not be granted judicial diversion. The court accredited Detective Arrington's testimony over that of the defendant and found that the defendant did "not want to accept responsibility for the unspeakable acts that took place at the Memphis Animal Shelter." The court observed that the defendant had no prior criminal record, had a "pretty good" social history, acknowledged his prior use of marijuana, and did not appear to have mental health problems. However, the court determined that diversion should be denied because of the need to establish a deterrent effect for such acts. The court had received letters "from across the country," as well as telephone calls from people "so upset about this case and especially about [the defendant]." Thus, the record is clear that the

-10-

court considered all of the necessary factors, and we conclude the evidence supports this determination.

## II.  Statements by the Trial Court Regarding Animals

On appeal, the defendant also has objected to statements made by the court regarding, as the defendant describes on appeal, its opinion "about the love of animals and whether or not the [defendant] thought that animals were God's creatures."

We note that the trial court's words to which the defendant objects were phrased as a question, not necessarily of the beliefs of the court regarding animals.  Therefore, this assignment of error is without merit.

## III.  Letters from the Public

Additionally, the defendant argues on appeal that the trial court "erred when it weighed letters from the public numerically against the supportive testimony and writings from the side of the [defendant] and allowed public opinion to affect its analysis of the sentencing factors."  To this assertion, the State responds that, in referring to the letters, the "court noted the public outcry regarding the defendant's crimes, and did so in the course of determining whether a denial of diversion or probation would serve the interests of justice, which includes whether a denial of such is in the public interest."  We agree with the State.  Previously, we have set out the court's statements regarding the letters, and, by our reading, the court, in referring to them, simply was explaining the widespread public interest in the case.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-11-